WALDES KOHINOOR, INC., Plaintiff,

v.

INDUSTRIAL RETAINING RING CO., Vincent Stabile, Madeline Stabile and Antoinette Stabile, Defendants.

Civ. A. No. 229-58.

United States District Court
D. New Jersey.

Nov. 1, 1961.

Gross & Stavis, by Morton Stavis, Newark, N. J., and Rubin, Baum & Levin, by Abraham G. Levin, New York City, Arthur H. Seidel, Philadelphia, Pa., of counsel, for plaintiff.

Kaufman, Kaufman & Kaufman, by Samuel Kaufman, Newark, N. J., and Sherman & Goldring, by Irving M. Atkin, New York City, James & Franklin, by Maxwell James, New York City, of counsel, for defendants.

WORTENDYKE, District Judge.

This Court has jurisdiction over the parties and of the subject matter of this case. 35 U.S.C. § 1 et seq.

Plaintiff is a corporation of the State of New York, and maintains its principal place of business in that State. The individual defendants are citizens of the State of New Jersey and constitute a partnership doing business as Industrial Retaining Ring Company in the Town of Irvington in that State. Venue is properly laid in this District. 28 U.S.C. § 1400(b).

Eight separate causes of action are set forth in the complaint, upon each of which issue has been duly joined. The answer of the defendants includes four counterclaims, which have also duly come to issue. In the first four causes of action in the complaint, the plaintiff seeks appropriate relief for the alleged infringement by the defendants of four United States patents, of each of which plaintiff is admittedly the owner. A soft copy of each of said patents is annexed to the complaint. The parties stipulated that the causes of action for the alleged infringement of the plaintiff's patents be tried to the Court, without a jury, in advance of the other causes of action involved in the case. This opinion embodies the Court's findings of fact and conclusions of law upon the trial of the plaintiff's patent infringement causes of action.

The defendants deny the validity of each of plaintiff's patents, and allege that the claims thereof relied upon are without true meaning, because insufficiently definite. Defendants concede, however, that the claims may be read upon the defendants' accused devices.

The first three of the patents with which we are presently concerned relate to improvements in retaining rings of a type adapted to be sprung into a seating groove provided therefor in a shaft or in a housing bore to serve as an artificial shoulder capable of securing a machine part against axial displacement. The fourth patent relates to improvements in means for handling open-type retaining rings. It discloses a tool for inserting such rings into, and for withdrawing them from, their seating grooves, and a magazine-type holder for such open-type rings, facilitating their vertical stacking in quantity, and from which they may be withdrawn as needed by means of the tool described in the patent.

The single question which this Court is presently called upon to decide with respect to each of the plaintiff's patents here in suit is that of its validity.

The first three of plaintiff's four patents are No. 2,487,802 (hereinafter '802), issued to Heimann November 15, 1949, upon application filed November 8, 1944; No. 2,487,803 (hereinafter '803) also issued to Heimann November 15, 1949, upon application filed August 21, 1947; and No. 2,491,306 (hereinafter '306) issued to Feitl December 13, 1949, upon application filed November 21, 1945. The fourth patent is No. 2,483,379 (hereinafter '379), issued to Brell September 27, 1949, upon application filed August 19, 1946.

For the purposes of this opinion, and as the term is used in the specifications and claims of the subject patents, a retaining ring is an artificial, removable shoulder which may be assembled in a circumferential groove in the external surface of a shaft, or within the bore of a housing, to prevent the axial displacement of the shaft relative to the machine part against which the shoulder abuts. Such a ring is a substitute for a shoulder cast integrally with a shaft or housing, which is not removable without destruction of the shoulder in disassembling the parts involved.

The retaining rings described in '802 are claimed to embody an improvement upon retaining rings described in Reissue Patent No. 18,144 issued to Heiermann on August 4, 1931. The '803 patent describes a claimed improvement in the so-called "E" retaining rings disclosed in United States Patent No. 2,206,454, issued to Benzing on December 31, 1935. The '306 patent describes rings of three types: internal (applicable axially), external (applicable axially), and external or crescent (applicable radially).

### Heimann '802

An appreciation of the features and functions of the device described in this patent requires its comparison with Heiermann Re. 18,144. Heiermann discloses tapered section-height, external and internal retaining rings which deform circularly when applied to a groove in a shaft or in a housing. Plaintiff admits that the Heiermann rings were known and in public use before November 8, 1944, when the '802 patent was applied for. The Heiermann ring is described in the specifications of the '802 patent. The tapered feature of the Heiermann rings is claimed to create sufficient elasticity or springiness to permit the firm retention of the ring in the groove in which it is inserted. The tapering taught by Heiermann was not dimensionally specified by him, but his ring was generally described as diminishing in thickness toward its open end portions, and having a wide middle surface. These Heiermann rings came into public use many years ago, in the United States as well as in Europe. The present litigants are in agreement that the affect of the tapering taught by Heiermann and embodied in the '802 patent was the maintenance of the circularity of the rings after deformation by spreading or compression, thus assuring a continuous pressure-seat of the ring

upon the floor of the groove in which it is inserted. I find from the evidence in this case that the only difference between the Heiermann Re. 18,144 ring and the embodiment of the '802 patent here in suit consists in the bowing of the '802 ring, as compared with the conceded flatness of the Heiermann ring. Plaintiff admits that the "rings of the '802 patent retain the structure of the Heiermann rings except that the rings of the '802 patent are symetrically bowed about a line extending transversely of the ring, substantially intermediate its middle section and its open ends by a calculated amount which is at least as great as the sum total of the maximum permissible tolerances of the machine part to be secured, the thickness of the ring, and the axial location of the groove in the shaft or housing within which the ring is retained."

Heiermann Re. 18,144 of August 4, 1931, taught the restriction of piston wrist-pins from longitudinal play by means of spring rings "tapering and diminishing in thickness toward the end portions" of the ring, and inserted in annular grooves in the wrist-pin, for the purpose of preventing axial displacement thereof. The ends of the ring are provided with openings for the accommodation of a tool for inserting or removing the ring from the groove. Having in mind that the Heiermann rings were flat, while the Heimann rings are bowed, it is obvious that if the thickness or interface cross-section of a flat ring and the width of the groove in which it is inserted are exactly equal, there can be no end-play between the faces of the ring and the walls of the groove. Moreover, if the plane of the end of the machine part is continuous of the plane of the near wall of the groove, and abuts tightly against the adjoining lateral face of the ring, there can be no end-play of the machine part relative to the shaft. If, however, dimensional tolerances exist between the respective surfaces of the units of the assembly, some degree of end-play will occur, which may be compensated for by a means of centric or preloading, i. e., the creation and maintenance of horizontal pressure in the direction of the axis of the shaft between the groove walls, the ring faces, and the machine part. A logical means of achieving such axial pressure is to be found in the employment of a horizontal spring device which will automatically adjust itself to the varying degrees of end-play resulting from the varying tolerances in the dimensions of the assembly units. Heimann's '802 provides this horizontal spring effect by bowing the Heiermann ring. Defendants contend that this does not constitute invention. Heimann claims that, by occupying the tolerances between the units, the bowed ring not only prevents end-play of the machine part relative to the shaft, but, through the preloading created by the bowing, a horizontal pressure is maintained against the end of the machine part which tends to brake any rotation of the part relative to the shaft,— a result similar to that which would be created by the insertion of a wedge or shim between the end of the machine part and the opposite wall of the groove.

The employment of a flat washer as a means of preventing or limiting the axial movement of a collar or sleeve upon a shaft is almost as old in the art as the wheel and axle. The use of a lock washer to prevent the rotation of a nut upon a shaft relative to a collar or sleeve of which the shaft forms the axis is also old in the art. The effectiveness of the lock washer in preventing rotation of the nut upon the shaft is created by the centric preloading resulting from the spring-like tension of the lock washer.

As long ago as 1879, in his United States Patent No. 216,512, Dalzell described a "curved (bowed) annular metallic spring-pressure washer" which he claimed would "secure an elastic bearing to resist the lateral play of carriage-wheels, (produced either intentionally or resulting from wear), * * *". Dalzell explains that the amount of "curvature" (bowing) given to his washer is regulated by "the depth of the nut, box, or axle-arm chambers in which it is plac-

ed, or such a degree of curvature that will fill extreme sizes, and by its compression the washer will adapt itself to any depth of chamber." He adds that his washer "may be cut and stamped to form in suitable dies with great facility." The '802 patent of plaintiff describes a retaining ring which is "symetrically bowed * * * by a calculated amount which is at least as great as the sum total of the maximum permissible tolerances of the machine part to be secured thereby, of the thickness of the ring and of the axial location of its groove in the shaft or housing." Heimann bows his ring "about a line extending transversely of the ring substantially intermediate its middle section and its open ends." Because his washer is circular, Dalzell does not limit its bowing to any of its diameters. Dalzell 216,512 was cited, with Heiermann Re. 18,144, as a reference by the Patent Office in Heimann '802. It seems clear, therefore, that the difference between the Heiermann flat ring and the Heimann bowed ring is similar in nature to the difference between a flat washer and the spring-washer of Dalzell.

A forerunner of the presently well-known lock-washer employing bowing or curvature of the washer to prevent loosening and unscrewing of a nut by maintaining a permanent pressure against the nut is disclosed in United States Patent No. 454,289 issued June 16, 1891 to Partz. He teaches the punching out of his washers from soft sheet steel and then pressing them between suitably shaped iron blocks into an arc followed by a hardening to a temper of an ordinary steel spring. He specifies the curvature of his washer as "that of a circle of from three to four times their own diameter" · so as to be curved throughout from opposite points, with these points resting upon a plane surface, thus presenting a diametric bulge to the nut. In use, the washers of Partz, when they are straightened by screwing down the nuts, "exert by their tendency to spring back into a curve a permanent pressure against them, and so prevent their turning loose through jarring or vibration." Partz adds that his washer "may be constructed of any desirable and convenient form other than circular."

A combination of radial and axial pressure by reason of the configuration of the clip is disclosed in United States Patent No. 1,088,402, issued to Burns February 24, 1914, embodying a "spring clip comprising a straight bar and opposite limbs of cylindrical wire having outwardly bent ends; said limbs being curved transversely with respect to the plane of the clip; whereby said clip is resiliently flexible in the direction of the length of said (tubular cylindrical electric insulation) bushing and transversely with respect thereto, * * *." The Burns clip, therefore, exerts radial and axial pressure.

The hose-coupling mounting of Miller, disclosed in United States Patent No. 2,078,453, issued in 1937, and the locking key for electric outlet boxes of Betebenner, described in United States Patent No. 2,236,130, issued March 25, 1941; both of which, together with Dalzell, Partz, Burns and Heiermann, are cited by defendants as anticipating Heimann '802, are examples of the achievement of a combination of axial and radial pressure by means of a clip or ring inserted in a groove or grooves.

A new and useful manufacture, as well as a new and useful improvement thereof is patentable. 35 U.S.C. § 101. The inventor is not entitled to a patent if the device was (a) "known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant * * *" or (b) "patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *." 35 U.S.C. § 102(a) and (b). "A patent may not be obtained though the invention is not identically disclosed or described as set forth in * * * (the foregoing conditions for patentability), if the differences between the subject matter sought to be patented

and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. Every inventor is presumed to have familiarity with the prior art, and is therefore chargeable with knowledge of the disclosures of all issued domestic patents in the field. Heiermann Re. 18,144 (as well as others of the cited prior art patents) is clearly within the prior art to which the teachings of Heimann '802 belong. I conclude that the '802 patent is an improvement over the Heiermann Re. 18,-144; but I am, nevertheless, called upon to determine, with respect to that improvement, whether it involves more ingenuity than might be expected of a mechanic skilled in the art to which both patents belong. See Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 40, 86 L.Ed. 58. In Cuno, the Court said: "More must be done than to utilize the skill of the art in bringing old tools into new combinations." The principle upon which the decision in Cuno turned is embodied, statutorily, in 35 U.S.C. § 103. That principle has a venerable history, as will appear from the authorities cited in the Cuno opinion. See also Hailes v. Van Wormer, 1873, 20 Wall. 353, 87 U.S. 353, 22 L.Ed. 241; Thatcher Heating Co. v. Burtis, 1887, 121 U.S. 286, 7 S.Ct. 1034, 30 L.Ed. 942; Office Specialty Manufacturing Co. v. Fenton Metallic Mfg. Co., 1899, 174 U.S. 492, 19 S.Ct. 641, 43 L.Ed. 1058; Grinnell Washing Machine Co. v. E. E. Johnson Co., 1918, 247 U.S. 426, 38 S.Ct. 547, 62 L.Ed. 1196; and Concrete Appliances Co. v. Gomery, 1925, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222.

The device described in the '802 patent here in suit displays a combination of features. It discloses a retaining ring which combines a tapering which permits a circularity of deformation and uniformity of pressure upon the floor of the groove in which it is inserted, with a preloaded axial pressure against the walls of the groove and machine part by virtue of the bowing of the ring. Tested by the application of the criterion early expressed in the Hailes case, supra, I am forced to the conclusion that the Heimann '802 patent device lacks invention because the results achieved through its use are "a mere aggregate of several results each the complete product of one of the combined elements." As we have above pointed out the tapering of the Heiermann flat ring achieved circularity in deformation plus a uniformity, substantial at least, in its pressure upon the floor of the groove in which it was inserted. The bowing of washers, along a transverse diameter created an axial pressure along the axle of a wheel compensating for lateral play of the wheel upon the axle, as taught by Dalzell. Heimann '802 merely combines features of Dalzell '512 and Heiermann Re. 18,-144. The combination or aggregation of these two old elements creates merely the sum of the results of each separately. Therefore, the combination of the elements does not achieve more than the aggregate of the results of each. This does not amount to invention. A mechanic skilled in the art to which each of the elements belongs, who is chargeable with knowledge of the existence of each element, and of its separate functional potential, must be presumed to have been capable of combining the two elements, and thereby achieving a sum of their respective results, which is the case with which we are here confronted. Plaintiff argues that invention cannot be avoided by a combination of prior art references, e. g. a combination of Dalzell '512 and Heiermann Re. 18,144, and cites 69 C.J.S. Patents § 21, p. 199, which states that "anticipation cannot be shown by reference to one prior device, patent, or publication for one part of an invention and to another device, patent, or publication for another." The principle quoted is not here applicable. Plaintiff is synonymizing patentability with anticipation. It is disclosure in the prior art which precludes patentability, 35 U. S.C. § 103. Where, as here, the state of the art of the time of the Heimann '802

disclosure was such as to make his combination of the teachings of Heiermann and Dalzell obvious, such a combination lacks patentability. Galion Metallic Vault Co. v. Edward G. Budd Mfg. Co., 3 Cir., 1948, 169 F.2d 72, certiorari denied 335 U.S. 859, 69 S.Ct. 132, 93 L.Ed. 405; Timken Detroit Axle Co. v. Cleveland Steel Products Corp., 6 Cir., 1945, 148 F.2d 267, certiorari denied 326 U.S. 725, 66 S.Ct. 30, 90 L.Ed. 430, rehearing denied 326 U.S. 808, 66 S.Ct. 136, 90 L. Ed. 492.

I find Heimann '802 invalid because it does not constitute invention. Therefore, the question of its infringement becomes immaterial.

## Heimann '803

This patent is claimed by the inventor to teach an improvement upon the so-called "E" retaining rings described in United States Patent No. 2,206,454 issued to Benzing on December 31, 1935. In the said patent Benzing claimed "a detachable resilient disk made of spring sheet steel having a central aperture and a radial slot leading into the central aperture, the radial slot presenting a disk composed of oppositely disposed integral resilient sections, yieldable relative to each other, each of said sections being provided with a recess opposite the radial slot and central aperture, defining an intermediate tongue element serving as an exact adjustment for the disk in relation to the center of the shaft to which said disk is attached, portions of the walls of the central aperture engaging the shaft and acting as clamping jaws thereby preventing the disk from chattering on said shaft."

In the specifications of his '803 patent, Heimann expressly refers to the preexistence of the Benzing '454 ring as maintaining the "advantages of the nearly closed ring, i. e. sufficient length of shoulder, ability to deform circularly, and precision fit against the groove bottom for its full arcuate length, while at the same time being designed to permit of a considerable amount of spreading in assembly without likelihood of breakage or the danger of taking on a permanent set. One such ring construction is disclosed in United States Patent No. 2,-206,454 (Benzing) dated December 31, 1935, according to which an open ring is made sufficiently resilient to be substantially spread without weakening of its middle section, which is most severely affected when the ring is spread directly over its shaft. Such resiliency without weakening is provided in the patented ring by forming two recesses in its inner circumference adjacent its middle section, the recesses being symetrically arranged to provide a tongue which protrudes inwardly at its middle section. Two other protrusions or tongues whose edges define the open ends of the ring, combine with the edge of the middle protrusion to give the ring secure holding power, with the substantial area of metal in the middle portion taking up the bending strains imparted to the ring when it is spread." Heimann then points out that Benzing's ring "is open to the objection that it is operative only in its own plane and hence is unable to exert any endwise force or thrust against the machine part located or retained thereby, being therefore incapable of taking up end play between the ring and machine part likely to result from unavoidable tolerances in the length of the machine part, in the thickness of the ring, and in the location of the groove." Heimann claims, therefore, in his '803 patent, what is in all respects a Benzing '454 ring; except that Heimann discloses "the ring body being bowed about a line extending transversely of the ring substantially intermediate its middle portion and said pointed (open) ends (of the ring) by a calculated amount which is at least as great as the sum total of the maximum principal tolerances in the dimensioning of the machine part to be secured thereby, in the thickness of the ring, and in the location of the groove in its shaft, the end protrusions being bowed similarly to the ring body, and the middle protrusion being unbowed and depending into the ring opening." It is apparent that Heimann's '803 patent modifies Benzing's '454 ring in the same

manner and with the same result as Heimann's '802 patent modifies Heiermann's Re. 18,144 ring, i. e., by bowing the retaining ring along a 9:00 o'clock–3:00 o'clock axis, and thereby achieving the take-up of the end-play desired. It will be noted that the degree or amount of bowing which Heimann applies to his "E" ring is as non-specific as in the case of the bowing of his '802 ring. It will be noted, however, that the bowing of the ring body of Heimann '803 does not include the middle protrusion, which is intentionally left unbowed, "and depending into the ring opening." I fail to find any more novelty in the bowing of the Heimann '803 ring over the unbowed Benzing ring than I found in the bowing of the Heimann '802 ring over that of Heiermann. However, the plaintiff contends that novelty is to be found in leaving unbowed the middle prong in conjunction with the bowed ring body and end protrusions of the '803 ring; thus permitting the exertion of uniform pressure on the groove floor with each of its three prongs. Plaintiff concedes that "if the middle prong is bowed, the ring will malfunction, since the middle prong will not hit the groove but will only hit the surface of the shaft" while "drastic distortion of the middle prong may affect the centric loading characteristics of the E ring and/or its pressure fit characteristics." Despite this contention, Dr. Heimann admitted on the trial that the bowing of the Benzing E ring did not produce centric loading, irrespective of whether or not the middle prong was bowed. He makes no reference to such an effect in claim 1 of his '803 patent, although in claim 2 he states that the bowing of the ring body causes the ring to function "as a circular spring ring and as a leaf spring exerting endwise pressure against the machine part, * * *." The specifications of '803 point out that "due to its spring construction, the compressed ring tends to return to its initially bowed shape and thereby exerts resilient endwise pressure against the machine part. By proper (but not specified) design of the ring, such pressure is sufficient to take up any end play of the machine part, whereby the ring is effective to secure the machine part in a substantially fixed position required, for example, in a mounting wherein the precision location of the machine part is important." In other words, says Heimann, the bowing of the ring gives it the effect of the "conventional circular spring retaining ring" of Benzing with an "ability to react against the outer wall of its groove as a double leaf spring, which exerts resilient endwise pressure against the machine part which it locates."

If, as I have concluded, the transverse bowing of the Heiermann Re. 18,144 ring taught by Heimann in his '802 patent in suit does not amount to invention, Heimann's transverse bowing of Benzing's E ring falls equally short of patentability, unless Heimann's failure to bow the ring's middle protrusion with the rest of the ring body creates patentable novelty. I am forced to answer the latter query negatively. Heimann's reason for leaving the middle inward protrusion unbowed is found in the specifications of his '803 patent where he states: "Preferably, the free or inner end of the protrusion * * * is not bowed as is the rest of the ring body and the end protrusions * * * but is formed straight, * * * so that upon ring assembly it extends parallel to the machine part end face * * * and the side walls of the groove * * *. The straightway formation of the protrusion * * * as it depends into the ring opening is desirable because, if bowed to correspond to the bowing of the ring proper, its inner edge * * * could engage against the outer side wall * * * of the groove and thus interfere with the desired functioning of the ring." It is apparent that failure to bow the center protrusion has no functional effect, but is required by the exigency created by the bowing of the ring body to permit achievement of the desired "resilient endwise pressure against the machine part." If Heimann's '803 patent discloses an improvement upon Benzing's '454, that improvement does not constitute invention. See Lincoln

Engineering Co. of Illinois v. Stewart-Warner Corp., 1938, 303 U.S. 545, 549, 58 S.Ct. 662, 82 L.Ed. 1008. However, whether bowed or unbowed, the middle protrusion of Heimann's E ring is not sincerely claimed as an improvement upon that of Benzing because it performs no new function in the later patent.

I must find the '803 patent invalid for the same reasons upon which I have based my conclusion of the invalidity of the '802 patent.

### Feitl '306

The application for this patent (Feitl '306) was made November 21, 1945, almost two years prior to the Heimann '802 and '803 patents, and it also was assigned to the plaintiff. The claimed invention is described by Feitl as "improvements in retaining rings of the type adapted to be sprung into a seating groove provided therefor in a shaft, housing bore or like carrying member and thereupon to provide an artificial shaft or bore shoulder capable of securing machine parts against axial displacement." Its specifications expressly recalled the disclosures of Heiermann Re. 18,144 (closed rings) and of United States Patent No. 2,382,948, issued August 14, 1945 to Brozek, describing "open" retaining rings. Feitl characterized those prior art rings as "being formed with a continuous taper, i. e. with a diminishing section height from their middle sections to their free ends, the tapering construction insuring effective circularity of the ring under deformation and permitting formation of the ring with an internal diameter smaller than that of the circle of the groove bottom, in the case of external rings, and with an external diameter greater than that of the groove bottom, in the case of internal rings."

The first claim of Feitl is "A retaining ring of the type adapted to be sprung into a seating groove provided therefor in a circular carrying member to form an artificial, uniform-depth shoulder thereon, said ring comprising an open-ended ring body whose shoulder-defining edge extends for its full arcuate length as the major arc of a circle and whose opposite edge is eccentrically disposed to the shoulder-defining edge in such manner that the section heights of the ring body decrease progressively from its middle portion towards its free end, whereby the ring body is adapted to maintain circularity in deformation, said free ends being provided with arcuately shaped lugs having appreciable arcuate length and a section height which substantially equals that of the middle portion of the ring body, the groove-engaging edges of the lugs extending as arcs of a circle concentric to the shoulder-defining edge and whose diameter is substantially equal to the diameter of the bottom of the groove."

The defendants contend that Feitl merely reverses the taper taught by Heiermann, and that this does not constitute invention because no new result flows from the reversal of the parts. Plaintiff concedes that Feitl achieved the advantage of a uniform-height shoulder for engaging the machine part by sacrificing full arcuate contact with the floor of the groove (in an external ring).[1]

It will be recalled that an external Heiermann ring must be spread over the end of the shaft in the course of its axial application to the groove, and that his internal rings must be contracted in order to insert them into the groove within the housing bore. The open ring of Brozek, by reason of the wide gap between its free legs, was intended to be applied to the seating groove radially over the shaft in a plane normal to the floor of the groove. This tapered construction of both open and closed types of ring achieved a tighter pressure fit of the ring against the bottom of its seating groove, with consequent increased security of the ring assembly. An addi-

---

1. Exhibit P–31 demonstrates the Feitl "closed" external and "open" rings in positions in shaft grooves; the former abutting a chamfered, and the latter a plane collar edge face. An external "closed" Heiermann ring is applied to the shaft circumference beyond the groove into which the Feitl "closed" ring is inserted.

tional advantage resulting from the tapering of the open end type of ring was a smaller gap between the ring legs, with consequent greater arcuate length of ring segment and more secure seating of the ring in its groove. However, as Feitl further points out, there was a disadvantage attendant upon the tapering of these rings which was found in the fact that they protruded unequally above the shaft surface or into the bore of the housing, and thus formed a shoulder of non-uniform depth, which limited the area of a machine part having corner radii or chamfer against which the ring face would abut. It was Feitl's objective to improve the Heiermann and Brozek rings by securing a uniform shoulder height throughout the exposed circumference of the ring and at the same time to retain the advantages of the taper, i. e., tight pressure fit against the groove bottom and maintenance of circularity under deformation. The advantage of a retaining ring of tapered section height over one of uniform section height is to be found in the readiness with which the former may be applied over a shaft or within a housing, with minimal stress of the center portion of the ring. There is a point beyond which the legs of a ring may not be spread, or contracted, without resulting in a "set" of the ring preventing its resumption of or tendency to approach its original circularity. It is the preservation of elasticity and the avoidance of "set" in the case of such a ring which enables it to exert uniform pressure upon the groove floor, by resuming, after it is positioned in the groove, its initial internal and external diameters. As explained by plaintiff's expert, if the plastic range of the ring is weakened through over-stress or over-strain in spreading or contracting the ring, the ring structure will achieve a permanent set, and its initial state of circularity will be permanently distorted. It was known, therefore, before Feitl applied for his patent, that the degree of uniformity of attainable groove floor pressure of a retaining ring was proportionate to its ability to approach circularity after spreading in the process of application to the groove. The resumption of circularity after application of the ring was a function of the tapering of the ring legs and it was the tapering which permitted the application of the ring to the groove, without exceeding the stress and strain limitations of the maximum cross-section of the ring body, and avoidance of the development of a "set" in the circularity of the ring. It was obvious that a taper of the legs of the ring was essential to the achievement of maximum effective groove floor contact. Tapering, however, created an eccentricity of the external circumference of the ring in relation to its internal circumference. This eccentricity, although a necessary concomitant of the tapering, resulted in non-uniformity of free shoulder height of the ring. The achievement of uniform free shoulder height necessitated concentricity of the ring's external circumference with that of the groove floor. A uniform section height ring would, of course, afford uniform free shoulder height of the ring, but the application of such a ring to the groove would destroy or radically impair its circularity, with reference to the groove floor. Some sort of tapering, therefore, was necessary in the body of the ring between its free ends and the opposite line of maximum cross-section, to afford the necessary hinge effect for spreading or compressing the ring legs on application to the groove. Feitl met this requirement by building up ring body cross-sections at the open ends of the ring equivalent in height to the portion of the ring body diametrically opposite the opening, and by creating, between these arcuate end portions, and the opposite center of the ring body, a reduction in the section height of each leg to afford sufficient elastic effect to prevent the development of a "set" in the ring on spreading or compressing its legs. Thereby he achieved a projection of the external circumference of the entire ring body to a uniform height above the shaft surface. This is the essence of the inven-

tion which Feitl claims to have made. Does it, by the criteria prescribed by the statute, reach patentability?

The Patent Office history of Feitl '306 indicates that all of the eleven initial claims made in the application were rejected on Heiermann Re. 18,144, Graham 2,131,948 ('948) and Brozek 2,382,947 ('947).[2] Applicant thereupon recast his claims with a numbering of 12 through 21, supplementing them by claims numbered 22 through 31. All of the claims were thereafter again rejected on the previously referenced prior art patents. In rejecting these claims, the Examiner made the following comment: "Brozek shows the construction of a continuous taper to insure effective circularity of the ring under deformation. The method used by the applicant to attain circularity under deformation is indistinguishable from the method used by Brozek. Heiermann and Graham show rings whose widths decrease from their middle sections and whose open ends are formed as lugs. * * * To invert the taper so as to form a uniform depth of shoulder or to form the lugs into substantial arcuate length does not amount to invention." At a personal conference between the attorney and the Principal Examiner, applicant's ring was successfully distinguished from Heiermann, Graham and Brozek. Thereafter the application was allowed and issuance of the patent authorized. The fact of such issuance, of course, creates a presumption of the validity of the patent. 35 U.S.C. § 282. The burden of overcoming this presumption rests upon the defendants, who impugn the patent's validity upon six counts:

1. Feitl achieves a retaining shoulder of uniform depth by reversing the taper of Heiermann.

2. The Feitl ring is used reversely to the Heiermann ring, i. e., the Feitl *external* ring is an equivalent of the Heiermann *internal* ring, and the Feitl *internal* ring is an equivalent of the Heiermann *external* ring.

3. Feitl employs the tapered arms of Heiermann as an equivalent of the bending arms of Benzing.

4. Feitl achieves a reinforced E ring by modifying the bending arms of Benzing.

5. The Feitl ring is anticipated by the prior public use of I. B. M. rings.

6. Feitl's tapered arms are equivalent to the bending arms of Graf (French).[3]

---

**2.** It should be noted that although the patent office originally rejected the application upon Brozek 2,382,*947*, *inter alia*, Feitl, in the application itself, states his invention as being an improvement upon Brozek 2,382,*948*. Both of these Brozek patents were issued on August 14, 1945, '947 upon, as stated in claim 1: "Securing means comprising an open-ended spring ring having outer and inner circular edges which are eccentrically arranged to each other in such manner that the section heights increase uniformly from the midsection to the free ends thereof," and '948 upon, as revealed in claim 1: "An open retaining ring of the type adapted to be sprung into a seating groove formed in a shaft and the like comprising a ring-form segment of spring metal, the gap-width of the segment being smaller than the diameter of the groove but large enough to permit the segment to be spread directly over the shaft in the plane of the seating groove, the inner and outer edges of the ring segment extending along circular arcs which are ec-

centric to each other and arranged so that the section heights of the ring segment decrease from the middle section to the free ends thereof."

It should further be noted that in the specifications in the Feitl '306 Letters Patent reference is made to the '*948* "open" retaining rings of Brozek, but at the conclusion of the Patent under "References Cited" mention is only made of Brozek's '*947* patent.

**3.** Graf (French Patent No. 873,965, issued April 13, 1942) taught (in translation) a "safety device for shafts and bolts, constituted by an open ring, engaged by force in a groove and acting as a spring outward or inward, characterized in that this ring is itself constituted by two or a larger number of rigid arcs of the same width in the shape of sectors, projecting beyond the edge of the groove, connected together by intermediate parts made thinner by cavities cut on the outer face or inner face of the ring end thereby made elastic."

Plaintiff refers to its '306 tapered spring rings as *inversions* of the tapered rings of Heiermann Re. 18,144. The taper in Heiermann's external ring creates eccentricity of the circumference of the outer edge with respect to that of the inner edge. The inner circumference is concentric with the groove bottom, while the outer circumference is eccentric with respect to the groove bottom. In the Feitl external ring the outer ring edge is concentric with respect to the groove bottom. The uniformity of height of the outer edge of Feitl above the groove wall for abutment against a machine part having a chamfer or corner radii, which is claimed as an improvement over Heiermann, is achieved by reversing or inverting the ring taper. This reversal or inversion destroys the concentricity of the inner ring edge with the groove bottom, but partially restores circularity of the inner edge by means of inwardly protruding lugs whose inner arcuate edges are concentric with the opposite inner edge of the ring body. Dr. Heimann conceded that "by reversing the taper of the Heiermann ring to produce the Feitl ring you sacrifice the advantages of a full arcuate contact with the floor of the groove and a full engagement of the side wall of the ring with the side wall of the groove for the advantage of having the uniform shoulder on the outside for engaging the machine part." The foregoing comparison of Heiermann and Feitl rings is graphically illustrated in exhibit D–17, as explained by the testimony of plaintiff's expert. Fig. 1 thereof is a Heiermann type ring, disclosing an all-around fit upon the floor of the groove, and an all-around engagement with the side-wall of the groove. Its outer shoulder is a tapered section of the ring which abuts the machine part while its inner shoulder is of uniform depth and engages the groove wall. Fig. 2 of this exhibit discloses a Feitl ring, only a part of the inner edge of which is in contact with the floor of the groove, and the remainder of that edge is out of such contact. The Feitl ring does not disclose an all-around engagement with the side wall of the

groove because of the areas of ring face which have been cut out of the ring body. Consequently, the thrust load capacity of Feitl against the wall of the groove is substantially less than the corresponding capacity of Heiermann. It is the inner or tapered portion of the Feitl ring which abuts the groove wall, while the outer portion of the ring presents a uniform section height for engaging the retained machine part. These comparisons, according to Dr. Heimann, are apposite to both internal and external rings of each of the patents. In his comparison of the so-called "open" ring of Feitl (Figs. 7, 8 and 9 of the patent) with the Benzing "locking disc" (Fig. 4 of patent '454) plaintiff's expert testified that both devices were appropriately termed "open" rings adapted to be sprung into a seating groove in the plane of the ring; that Benzing had an outer shoulder of uniform depth with its shoulder-defining edge extending for its full arcuate length as the major arc of a circle, and that this was equally true of the "open" ring of Feitl. The free ends both of the Benzing and of the Feitl rings are "provided with arcuately shaped lugs for an appreciable arcuate length." The lugs of each ring have section height substantially equal to that of the middle portion of the ring in each case; and the groove engaging edges of the lugs on each ring constitute arcs of a circle having a diameter substantially equal to that of the bottom of the groove. The ring body of each of these "open" rings does not greatly exceed 180°.

Defendant contends that Feitl's reversal of the Heiermann taper does not amount to invention and cites N. S. W. Co. v. Wholesale Lumber & Millwork, Inc., 6 Cir., 1941, 123 F.2d 38. We must, of course, agree with the proposition that position, rearrangement and transposition of parts do not alone spell invention. See General Machinery Corp. v. Clearing Machine Corp., 7 Cir., 1939, 104 F.2d 553; Simplex Wrapping Machine Co. v. Schultz, 9 Cir., 1942, 128 F.2d 138. Heiermann taught the use of a tapered ring to achieve maximum groove floor

contact; while Feitl employed this taper in reverse to achieve uniform height for machine part abutment. The function of the taper in the case of each ring is the maintenance of circularity when the ring is in an applied position. In Heiermann, the circularity conformed to that of the groove bottom, while in Feitl it conformed to the circumference of the exterior of the shaft. These respective conformities were accomplished by reversal of the order of the eccentricity between the inner and the outer edges of the ring. I cannot conclude that the internal ring of Feitl amounts to invention over the external ring of Heiermann.

Since the internal ring of Feitl is generally similar in shape and form to the external ring of Heiermann, and the Feitl external ring is generally similar in shape and form to the internal ring of Heiermann, can the application of the prior art of an external ring to an internal ring, and vice versa, amount to invention? This question must be answered in the negative in view of the testimony not only of the defendant's expert, but of the expert for the plaintiff as well. In explaining exhibits D–19 and D–20, Prof. Fazekas, the expert for the defendant, testified that drawing "X" in D–19 represented both an internal type of Heiermann ring and an external type of Feitl ring, while that shown in exhibit D–20 represented both an external Heiermann ring and an internal Feitl ring. Each drawing discloses the ring mounted in a groove intended for its reception. The difference in the gap width of the ring of each inventor is approximately 5°. As illustrated in the respective exhibits, the rings would function similarly whether the gap width was slightly smaller or slightly greater than as shown in the witness' drawings. Dr. Heimann, the expert for the plaintiff, testified that if the ring shown in D–19 were used as an external ring, he would say that a Feitl ring was being used, but if it were used as an internal ring, he would say that it was a Heiermann ring. With respect to the ring shown in D–20, Dr. Heimann testified that if it were used as an inter-nal ring, he would say that it was the Feitl invention, but if used as an external ring, it would embody the invention of Heiermann. It seems obvious to me that Feitl is a new application of an old device which does not constitute patentable invention. See Cuno Engineering Corp. v. Automatic Devices Corp., 1941, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58; Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co., 1884, 110 U.S. 490, 4 S.Ct. 220, 28 L.Ed. 222; Pennsylvania Crusher Co. v. Bethlehem Steel Co., 3 Cir., 1951, 193 F.2d 445.

The modification of Benzing by Feitl, in view of Heiermann, does not amount to invention. The so-called "open" retaining ring was disclosed in Benzing '454 and in Brozek '948. Benzing claimed "A detachable resilient disk made of spring sheet steel having a central aperture and a radial slot leading into the central aperture, the radial slot presenting a disk composed of oppositely disposed integral resilient sections, yieldable relative to each other, each of said sections being provided with a recess opposite the radial slot and central aperture defining an intermediate tongue element serving as an exact adjustment for the disk in relation to the center of the shaft to which said disk is attached, portions of the walls of the central aperture engaging the shaft and acting as clamping jaws thereby preventing the disk from chattering on said shaft." (For discussion of the Brozek claims see footnote 3, supra.) Feitl's "open" retaining rings are described in claims 1 and 5 of his '306 patent in the following language:

"1. A retaining ring of the type adapted to be sprung into a seating groove provided therefor in a circular carrying member to form an artificial, uniform-depth shoulder thereon, said ring comprising an open-ended ring body whose shoulder-defining edge extends for its full arcuate length as the major arc of a circle and whose opposite edge is eccentrically disposed to the shoulder-defining edge in such manner that the section heights of the ring

body decrease progressively from its middle portion towards its free end, whereby the ring body is adapted to maintain circularity in deformation, said free ends being provided with arcuately shaped lugs having appreciable arcuate length and a section height which substantially equals that of the middle portion of the ring body, the groove-engaging edges of the lugs extending as arcs of a circle concentric to the shoulder-defining edge and whose diameter is substantially equal to the diameter of the bottom of the groove.

\* \* \* \* \* \*

"5. A retaining ring as set forth in claim 1, wherein the lugs protrude radially inwardly so that their inner edges and the inner edge of the ring at its middle portion form the groove-seating edge of the ring."

The Feitl closed type split external ring is an inversion of the Heiermann closed type split internal ring. All of the "closed type" rings are applicable axially into a groove upon a shaft or within a bore. The "open type" rings are applicable radially into a groove on a shaft. The only difference between Feitl's open rings and his closed types of ring is to be found in the greater arcuate length of the circumference of the ring body and the shorter arcuate lengths of the inwardly protruding end lugs. The outer circumference of all of the Feitl rings is concentric with the axis of the shaft and groove floor and extends to a uniform height above the groove walls. In other words, Feitl open rings achieve circular deformation and uniform shoulder height.

Simply stated, the feature of the Feitl ring which is claimed as an improvement upon the Heiermann ring is the former's presentation of a shoulder of uniform depth to the machine part being retained. The other features of both rings are similar, i. e., each ring is of tapered section height and is thereby enabled to deform circularly. The tapering of Heiermann, while achieving circularity, results in ec-

centricity of the outer circumference and non-uniform shoulder depth. Feitl "builds out" the outer circumference of Heiermann to concentricity by means of inwardly protruding arcuate end lugs on the inner circumference of the ring. These groove floor contacts by the end lugs and center portion of the inner circumference of Feitl external rings are substituted for full arcuate contact of the inner circumference of the Heiermann ring. Similarly, the employment by Feitl of outwardly extending arcuate lugs to fill out overall circularity of the outer circumference of his internal tapered ring as seated in a bore groove creates uniformity of ring shoulder height within the bore. The uniformity of shoulder depth of the Feitl rings results from the equivalence of the cross-sections of the end lugs and the middle portion of each ring. The taper of the Feitl internal ring involves the outer edge, while the taper of his external ring involves the inner edge of the ring. Tapering being necessary to permit ring application to groove without "setting" the ring's circularity, but tapering causing non-uniform shoulder height, employment of the arcuate end lugs preserved the advantage, but obviated the disadvantage. Heiermann's end lugs, extending inwardly in his internal and outwardly in his external ring, served merely to contain the holes into which the applicator tool was inserted. His lugs served but minimally as a machine part retaining shoulder.

It is further the contention of the defendants that Feitl's open ring is a noninventive modification of the tapered E ring which was then old in the prior art. This contention was illustrated by defendants' expert by means of Exhibit D–60, which was entitled "E–Ring Modified to Tapered E–Ring" and by Exhibit D–61, entitled "E–Ring Modified to Crescent Tapered Ring." In each of these drawings the solid lines delimit an E ring with the inner arcuate edges of the center lug and of the end lugs resting upon the floor of a shaft groove. In Exhibit D–60 the inner edge of the ring

768

body has been tapered between the center lug and the end lugs, leaving the embodiment still an E ring. In D–61 the protrusion of the center lug has been eliminated by tapering the inner edge of the ring body in an arc commencing at the beginning of the end lug on each leg of the device and coinciding with what was formerly the inner arcuate edge of the center protrusion, thus modifying an E ring into a crescent tapered ring. In each exhibit maximum shoulder height of the exterior arc of the ring is maintained by what is in effect the coincidence of the inner arcuate edges of the end lugs and the center protrusion. The elimination of the center protrusion by means of the tapering of the ring legs between that protrusion and the end lugs has transformed the E ring into a crescent tapered ring. While the obviousness of these modifications is not to be appraised by hind-sight, similarity with the prior art in which the manufacture and use of untapered and tapered E rings had been taught should have suggested the modification to those prior art embodiments, which Feitl achieved in his '306 open ring.

A further ground of defendants' contention that the Feitl patent is invalid is to be found in their allegation that the patent was anticipated by the prior use of International Business Machines rings of the character described in the plaintiff's catalogue as reinforced E rings series 5144. That ring series is referred to in the catalogue (D–16) as covered by the Feitl '306 patent. This declaration, however, was denied by Dr. Heimann during the trial, who stated that the relation of the ring series to that patent was erroneous and resulted from misunderstanding on his part. Accepting Dr. Heimann's explanation, I am still of the opinion that plaintiff's 5144 series rings as described in its catalogue were in public use or on sale in the United States more than one year prior to the date (November 21, 1945) of Feitl's application for his patent. The parties stipulated that the drawing of the retaining clip annexed to the stipulation and designated as Print No. 25,282, was made by or for International Business Machine Corp. in March or April of 1938; and that the Dunbar Division of Associated Spring Corp. of Bristol, Connecticut received its first order for the tooling up and making of the retaining clips illustrated in the drawing on May 11, 1938, and thereafter produced such clips for International Business Machines Corp. as ordered from time to time. Also annexed to the stipulation is a further drawing, No. 123,206, made by or for the International Business Machines Corp. on March 17, 1938, which also illustrates a retaining clip generally similar in design to that illustrated in the other drawing. Despite the conflict of opinion of the experts for the respective parties, I find from the testimony and the exhibits in this case that both the IBM ring and plaintiff's 5144 rings are similarly tapered, they approach circularity in deformation, and that approach to circularity is closer in plaintiff's 5144 ring than in the IBM units.

The monopoly which a patent affords should not be lightly bestowed. Congress has statutorily declared that an improvement in an old device is not patentable "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. The application of this criterion impels me to the conclusion that the Feitl rings were not patentable and that the Feitl patent is therefore invalid. By concluding the devices disclosed in Feitl '306 were not patentable for lack of invention, it becomes unnecessary to consider defendants' further contention that the aggregation of the patents of Graf and Heiermann by substituting tapered spring bending arms of Heiermann for the spring bending arms of Graf, to achieve groove bottom set, did not amount to invention.

### Brell '379

The embodiment of this alleged invention is a tool for handling external retaining rings. The claims of the patent relate only to the tool; not to the stacking device in connection with which the tool is used. Plaintiff's expert, Dr. Heimann, stated that the distinguishing characteristic of the device, as illustrated in Fig. 1 of the patent, was the angle formed by the walls of the jaws of the tool, which are designed to hold with greater security, the ring to be applied to the groove. Dr. Heimann referred to the tool as "a special tool which grips the ring with elastic jaws directly, without any other manipulation."

Upon an application filed August 19, 1946 patent No. 2,483,379 was issued to J. Brell on September 27, 1949 and by him assigned to the plaintiff. The patent specifications state that the invention claimed "relates to improvement in means for handling retaining rings and has particular reference to tools for inserting retaining rings of the so-called open type in and for withdrawing such rings from their seating grooves, as well as to a magazine-type holder for such rings, which facilitates stocking thereof in quantity, and from which the rings can be withdrawn as needed by a tool as aforesaid." The first of Brell's two claims reads as follows:

"1. A tool for inserting 'open' retaining rings in their shaft grooves comprising a pair of thin, coplanar arcuate jaws which together form a part-circular recess of arcuate length corresponding substantially to that of the ring and having a normal diameter which is slightly less than the outer diameter of the ring, and means resiliently interconnecting said jaws, the arcuate inner edges of the jaws being undercut to provide a ring backing flange and a ring-edge seating groove, the resilient interconnection of said jaws providing a resilient clamping of ring in seating groove during handling, while permitting the jaws to spring apart in the op-

erations of pushing the tool edgewise on to a ring, of forcibly inserting the ring in its shaft groove and of withdrawing the tool edgewise from the ring following its insertion in a shaft groove, and the backing flange and ring-edge seating groove cooperating one with the other in maintaining the ring in its plane during handling and when it is being forcibly inserted in its groove."

The rings in storage are stacked upon a vertical rod from which they are successively removed by the tool from the bottom of the stack.

The parties had stipulated, during the discovery process, that the publication of National Lock Washer Company, forming a part of exhibit D–32, had a date more than one year prior to the filing of the Brell application. This publication illustrates a ring applicator which plaintiff conceded consisted of an expandable jaw with a handle receptive to the exterior circumference of an open ring for use in the application of such a ring to a shaft and that the two faces of the set of that applicator tool formed a right angle with each other; the shape of the recess conformed generally to that of the exterior circumference of the ring. The defendant conceded that the Brell device substituted an acute angle for the right angle formed by the seating edges of the ring receiving groove, whereby the tool was enabled to seat the ring more securely in the recess of the jaws. It is defendants' contention that the undercutting of the seating edges of the tool jaws to enhance the security of the ring within the jaws was so well known and expedient as to render unnecessary the consideration of any prior art patents. Defendants' refer the Court to the dictionary definition of a bezel as "a groove and flange made to receive a beveled edge, as that which holds a watch-crystal in the rim or a gem in its setting; * * ". Defendants also rely upon United States Patent No. 319–775 issued June 9, 1885, to Barney, entitled "Implement for attaching washers on roller skates" in which the alleged inventor claims curved

recesses at one side of the jaws of a plier-like tool and on the opposite side protruding studs, with V-shaped edges on the side next to the opening between the jaws,—by means of which tool a split washer might be inserted into an annular groove near the end of a roller skate axle and its separate edges forced together, thus creating a rigid circular shoulder on the exterior of the wheel to hold it upon the axle. Having in mind that the open type rings, for the handling of which the tool of the '379 patent was designed, are flat or somewhat bowed, and therefore might easily escape from right-angularly recessed tool jaws, an obvious preventive of this escape would be the substitution of an acute for the right angle of the recess. In view of the absence of invention in the devices involved in Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, in Alco Kar Kurb Inc. v. Ager, 3 Cir., 1961, 286 F.2d 931, and in Aetna Steel Products Corp. v. Southwest Products Co., 9 Cir., 1960, 282 F.2d 323, certiorari denied 365 U.S. 845, 81 S.Ct. 804, 5 L.Ed.2d 810, I can discern no invention in Brell. Accordingly, his patent is hereby declared invalid.

We have considered the numerous decisions cited by plainti_ in support of the presumed validity of the patents here in suit, of which Diamond Rubber Co. v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527, and Goodyear Tire & Rubber Co. v. Ray-O-Vac Co., 1944, 321 U.S. 275, 64 S.Ct. 593, 88 L.Ed. 721, are among the best known expressions of the Supreme Court's views upon the subject of improvement patents. In Diamond Rubber the "tipping capacity" of the tire upon the rim of the carriage wheel constituting the embodiment of the patent there in suit was found to constitute a patentable improvement over the prior art. In Ray-O-Vac the patentable improvement was found to be the provision of (321 U.S. at page 277, 64 S.Ct. at page 594) "an insulating material and an outside protecting metal sheath which would enclose the insulated side walls of the zinc cup (of a dry cell flashlight battery) and tightly embrace both upper ond lower closures to prevent (the) leakage" which characterized the prior art cells. On the other hand, in Cuno Engineering Corp. v. Automatic Devices Corp., supra, the same Court found lack of invention and a mere exercise of the skill of the calling in an improvement in an automobile cigarette lighter by the addition to the prior art "cordless" lighter of a thermostatic control responsive to the temperature of the heating coil. Although recognizing that the functions performed by the new combination were new and useful, the device did not constitute invention because it resulted from the utilization of the skill of the art in bringing old tools into new combinations. The Court approved Hotchkiss v. Greenwood, 1851, 11 How. 248, 13 L.Ed. 683, in holding (at 314 U.S. at page 90, 62 S.Ct. at page 40) that "if an improvement is to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art." While I recognize that the embodiment of each of the patents here in suit is an improvement over the relevant prior art, I am of the opinion that the improvement in each instance fails to disclose more ingenuity than the work of a mechanic skilled in the art to which each of the patents belongs.

By reason of my conclusions that all four of the patents sued upon by the plaintiff in this action are invalid, it becomes unnecessary for me to consider or discuss the issue of infringement. Suffice it so say, however, that as previously pointed out, the defendants concede that their accused devices read upon the claims of the patents in suit, therefore, if those patents were held valid, such concession would force a conclusion that they were infringed.

This opinion shall be deemed to constitute my findings of fact and conclusions of law in compliance with the provisions of F.R.Civ.P. 52, 28 U.S.C. An order may be presented in conformity with the views hereinabove expressed.