**PLANT ECONOMY, INC., Plaintiff,**

v.

**MIRROR INSULATION CO., Inc.,
Defendant.**

Civ. No. 987–58.

United States District Court
D. New Jersey.
March 27, 1962.

Martin Roth, Newark, N. J. (Irving Seidman, New York City, New York Bar), for plaintiff.

Katzenbach, Gildea & Rudner, Trenton, N. J. (George Gildea, Trenton, N. J., and Dwight B. Galt, Washington, D. C., District of Columbia Bar), for defendant.

LANE, District Judge.

Plaintiff seeks a declaratory judgment invalidating defendant's United States Patent No. 2,841,203. 28 U.S.C. § 2201. Plaintiff is a corporation organized under the laws of the State of New York, having its principal place of business in that state. Defendant is a corporation organized under the laws of the State of Delaware with its principal place of business in New Jersey. Jurisdiction rests upon 28 U.S.C. § 1338(a), which gives the district courts original jurisdiction of any civil action arising under any act relating to patents. Notwithstanding the various allegations that the parties have asserted within the complaint and the answer, it was stipulated at trial that the sole issue to be decided by the court was the validity of Patent No. 2,841,203.

Plaintiff is the assignee of United States Patent No. 2,613,166 issued to George E. Gronemeyer on October 7, 1952. Defendant is the assignee of United States Patent No. 2,841,203 issued to George E. Gronemeyer on July 1, 1958. Both Gronemeyer patents relate to thermal insulation.

George E. Gronemeyer, president and chief engineer of defendant Mirror Insulation Company, Inc., was graduated from Case Institute of Technology in 1931 with a degree in mechanical engi-

neering and has since specialized in the field of heat transfer and in recent years, more particularly, in thermal insulation. He first designed equipment, including thermal insulation structures, and, in 1939, became associated with the duPont Company with responsibility as consulant in thermal insulation. During the nine-year period spent with duPont in preparing insulation standards, evaluating bids on thermal insulation and approving specific material for such projects, Gronemeyer found there was little known about reflector-type thermal insulation and that in the high-temperature area there was no product on the market. He had had some success experimenting with reflector sheets in the refrigeration zones of temperature with duPont. In 1947, Gronemeyer resigned his employment to engage independently in the field of reflector-type thermal insulation. On March 11, 1949, after a period of experimentation, he filed application for patent. Four years later United States Patent No. 2,613,166, presently owned by plaintiff, was issued.

While the patent was pending, Gronemeyer undertook to manufacture and sell the reflection-type he had designed using insulant material for supporting the reflection sheets, and, in 1951, decided he lacked sufficient funds to finance the production required. Whereupon, he entered into an arrangement with a manufacturer, Hunter Manufacturing Company. During the ensuing two-year period, Hunter's sales of reflector-type thermal insulation manufactured under the Gronemeyer patent aggregated nearly one million dollars.

The Gronemeyer product manufactured by Hunter consisted of one or more layers of resilient heat-reflective metal insulating sheets held in position by a spacer ring formed of low-heat conducting material having annular grooves to separate and receive the ends of the inner insulating sheets to form isolated air space. It was thought the insulant material used for support rings had sufficient permanency to last throughout the insulating unit's period of use. However, experience proved the insulant material would deteriorate and break down. Under sustained heat, it would powder at the points where screws were inserted, causing destruction of the insulating effect of the unit.

An expert in the thermal insulation field with 26 years experience, presently serving as staff engineer in charge of thermal insulation with Union Carbide Chemicals Company, testified that in using the product manufactured under the first Gronemeyer patent it was found that the end rings supporting the inner reflecting sheets and attached to the outer case with screws were made of 19-pound calcium silicate; that the rings were too fragile, causing the sheets to sag, and often fractured rings had to be replaced; that the rings became saturated, and, as a result, small fires occurred within the insulation structure; that the silicate, being very absorbent, would pick up any leakage from the pipe system and hold it as a wick and the high temperature of the pipe would cause the material to burn; that Hunter Manufacturing Company suggested, as a correction, the use of 23-pound marinite density rings in place of the 19-pound calcium silicate density rings; and that Union Carbide's test of marinite revealed it to be too absorbent for such usage and that its use would not lessen frequency of the fires occurring within the insulation structure.

Gronemeyer terminated his association with Hunter in 1953 and undertook further experimentation with thermal insulation in an effort to eliminate the deficiencies experienced with ring breakage and ring absorption. In time, he turned from the concept of utilizing nonconducting material so as to prevent a flow of heat to and through the reflecting sheets to a concept of using extremely thin sections of very high-conductivity material with an arrangement of small surface contact. In his model Gronemeyer used a thin diaphragm of 18/8 stainless steel fastened to the outer case and supporting the outer case from the pipe on a sharp inner edge. From the thin diaphragm there was set up a

series of fingers which were so arranged as to have a line contact at the extreme ends and a line contact in between the reflecting sheets in support of these inner reflecting sheets. The supporting diaphragm of stainless steel had greater strength than the aluminum sheets it held in place. In describing his new patented product, Gronemeyer stated: "So where we once had a weak link in the chain, we now have the strongest link. Stainless steel is not weakened or softened by heat, whereas you can probably melt the aluminum away and still have the stainless. * * * This specific construction admittedly does not bring into the world any new principles. This line contact and the use of parallel reflecting sheets are old, we know that, but nobody else ever saw how to put it together and come up with a structure like that that was practical. It wasn't there."

In the all-metal insulation produced by defendant company under the second patent, many of the defects found in the product manufactured under the earlier Gronemeyer patent have been eliminated. The all-metal insulation has eliminated the absorption of the fluid contained in the piping covered, and there no longer exists the problems that had been experienced with the fracturing of the supporting rings and the danger of inflammability resulting from ring absorption and high temperatures. The stainless steel diaphragms are not fragile as was the non-conducting substance used in the first product, but are, in fact, of an extremely rugged nature. The user no longer troubles himself with the problems of storage and the breakages in shipping. The new product presents no difficulty in regard to expansion and contraction at elevated temperatures as great as 1000° Fahrenheit.

■■ A new and useful manufacture, as well as a new and useful improvement thereof is patentable. See 35 U.S.C. § 101. The inventor is entitled to a patent unless the device was known or used by others in this country or patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. See 35 U.S.C. § 102. One may not obtain a patent if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. See 35 U.S.C. § 103.

■■ Thus, every inventor is presumed to have familiarity with the prior art; therefore, he is chargeable with knowledge of the disclosures of all issued domestic patents in the field. It is plaintiff's contention that because of the familiarity of the simple concepts and procedures embodied in the patent, the resulting combination is not a novel and useful invention worthy of patent protection, but a mere anticipation in the prior art.

The later Gronemeyer patent, No. 2,-841,203, is an improvement of the earlier Gronemeyer patent, No. 2,613,166. This court is now called upon to determine with respect to that improvement whether it involves more ingenuity than might be expected of a mechanic skilled in the art to which both patents belong.

■ It is established that the "mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than that theretofore performed or produced by them, is not patentable invention." Lincoln Engineer Co. v. Stewart-Warner Corp., 303 U.S. 545, 549, 58 S.Ct. 662, 664, 82 L.Ed. 1008 (1938). Compare the similar language in Richards v. Chase Elevator Co., 159 U.S. 477, 487, 16 S.Ct. 53, 40 L.Ed. 225 (1895). Cuno Engineering Corp. v. Automatic Devices Corp, 314 U.S. 84, 89, 62 S.Ct. 37, 40, 86 L.Ed. 58 (1941) states, "More must be done than to utilize the skill of the art in bringing old tools into new combinations."

Our inquiry must be directed to the question whether the combination in suit

is novel and whether it passes the line sometime tenuous and difficult of ascertainment which separates mechanical skill from invention. In pursuit of this inquiry we first turn to a consideration of the state of the art existing prior to Gronemeyer's later application.

We are in agreement with plaintiff's contention that the prior art in the field of thermal insulation demonstrates:

1. The basic concept of forming heat insulation from spaced metal sheets with suitable spacer means to maintain such spacing goes back as far as the late 19th century. For example, the Pierce patent 208,264 of 1878, the Pierce patent 236,077 of 1880, and the McKinney patent 363,663, reflect the fundamental idea of creating heat insulation from spaced metal sheets. Also, the use of multiple spaced insulating sheets is manifested in later patents, namely, Fitzpatrick 1,340,-332 of 1920, Waldorf 1,383,680 of 1921, the LeGrand patents 2,050,663 and 2,078,-606, Wallach 2,142,542, and the earlier Gronemeyer patent 2,613,166.

2. The principle of reduction of heat loss by minimum contact between materials of thermal conductivity is incorporated in the Schmidt's British patent 317,678 of 1929. Also, in the Black patent 2,088,400 of 1937, one may note a metal insulation for a pipe where the insulation includes spaced projections to allow fewer points of contact and, therefore, lower heat losses from conduction.

Further examination reveals numerous references in the prior art relating to use of materials with low conductivity characteristics,—(a) use of wood, ceramics or metals of spacer materials of low-heat conduction capacity in the Schmidt patent 317,678 of 1929; (b) "These materials are particularly suitable owing to their low-heat conductivity"—British patent specification 317,678 of 1929; (c) "metallic strips having relatively low thermal conductivity secured to the side edges of said sheets for holding the latter in predetermined spaced relationship with respect to each other"—LeGrand patent 2,078,606 of 1937; (d) "The disks and cylinders are held together by securing them to low-heat conductivity reinforcing rings which are also split to match the end closures"—the earlier Gronemeyer patent 2,613,166 (1952).

The patent in suit departs from the earlier prior art concept of the use of materials with low-conductivity characteristics. It is cited in the patent application that, "the use of certain non-conductor insulating type materials as structural elements" has been the outstanding reason for physical failure of some forms of reflective insulation structure theretofore proposed. "An object of the present invention," Gronemeyer asserts, "is to provide an all-metal thermal insulation structure having hitherto unobtainable ruggedness, durability, light weight, and high efficiency performance * * * incapable of deterioration." In addition, he states, "For heat and cold insulation, I employ support sheets of thin stainless steel to support and space the metal insulating sheets arranged transverse thereto. Such a support sheet has a thermal conductivity of roughly one hundred or more times that of non-conductor or insulator type materials."

When Gronemeyer abandoned the utilization of spacer rings of insulating absorbent material in favor of a new, completely opposite concept—thin, non-absorbent materials, diaphragms of heat-conducting material to serve as the rigid ends of each unit for the support of the spaced-apart insulating sheets—he overcame the faults and defects of his prior product. The thin stainless steel diaphragms used are highly heat-conductive and have a high ratio of strength, toughness and durability when exposed to heat. In adopting the thin diaphragms of stainless steel as the end supports or heads, it was found necessary to reduce as much as possible heat conductivity radially through the diaphragms. This was accomplished by the deflection of the inner edge of the diaphragm to bring about line contact with the surface being insulated, thus limiting the heat influx to the diaphragm. Gronemeyer developed

a practical means for supporting the spaced-apart heat reflective sheets by the use of thin highly-conductive diaphragms with minimum of opportunity for heat transmission from the sheets of the diaphragms to permit expansion and contraction of such sheets due to variations in temperature. In effecting this improvement, he developed inturned, serrated flanges on the diaphragms with provision for fingers to support the sheet ends in line contact, and thus provided for unimpeded expansion or contraction radially, circumferentially, or longitudinally. These radical changes made by Gronemeyer, after he had completed some twenty years of study in the field of thermal insulation, rendered the product manufactured under the subject patent the only workable one on the market for use in insulating lines through which fluids of a temperature of 500° Fahrenheit and greater are transmitted.

Plaintiff also contends that subject patent is invalid because of defendant's failure to point out the claims with particularity. Plant Economy argues that the specifications state the insulating sheets are heat-reflecting and of aluminum, aluminum alloy, zinc alloy, stainless steel, or any metal having the property of high heat reflectivity and of self-supporting character, and the support sheets employed are of thin stainless steel to hold in spaced position the metal insulating sheets arranged transverse thereto; however, in the seven claims contained in the patent, the diaphragms are described as of heat-conducting material and the insulating sheets are not described as metallic or non-metallic. Plaintiff would have this court conclude that if the diaphragms and/or insulating sheets are all non-metalic materials with low-heat conductivity as compared to the high-heat conductivity of metallic materials, then the limitations as to line contact are wholly without significance because the line contact effect on a low-heat conductivity material would be inconsequential, and, absent line contact, there is no novelty in this invention. Plant Economy argues, subject patent, in failing to specify "metal" diaphragms and "metallic" insulating sheets, has been made so indefinite and so broad as to render such claims invalid.

We find a more than adequate answer to these contentions in the last paragraph of the specifications:

"In *all the designs covered by this invention, the outer case normally is a heat reflective metal insulating sheet, but in special instances it may consist of any other metal or plastic in order to meet corrosive or other unusual conditions.* Outstanding advantages of the invention are that it offers to industry a thermal insulation product fabricated in units for rapid low cost installation on pipes, curved surfaces and flat surfaces, and the units may be *available in all metal construction to offer a product of hitherto unobtainable ruggedness, durability, lightweight, high efficiency performance, weather resistance, and thermal shock resistance, at moderate cost.* The manner in which these units are constructed and assembled produces great tensile strength, and enables the units to be applied to the surface to be insulated by simple methods, thus economizing time and cost of field installation without the sacrifice of ruggedness or insulation efficiency. Moreover, the manner in which the various sections are secured together, both transversely as well as longitudinally of the surface to be insulated, insures positive locking of all joints in such manner as to minimize the opportunity for heat loss at the joints." (Italics added.)

The failure to specify a metal diaphragm does not render the subject patent invalid as it would be recognizable to someone educated in the art that Gronemeyer, by his reference to "heat conducting material" in his claims, is referring to metal or other substances with similar properties. In addition, it would seem clear from the specifications and claims that the inventor did not intend to confine himself to heat-reflective metal

insulating sheets, but, in fact, specified that in special instances insulating sheets composed of any other metal or plastic materials might be used in order to meet corrosive or other unusual conditions.

The United States Circuit Court of Appeals (3d Cir.) in Pyrene Mfg. Co. v. Boyce, et al., 292 F. 480, 481, cert. denied 263 U.S. 723, 44 S.Ct. 231, 68 L.Ed. 525 (1923) states:

> "Invention is a concept or thing evolved from the mind, and is not a revelation of something which existed and was unknown, but is the creation of something which did not exist before, and possessing the elements of novelty and utility in kind and measure different from and greater than, what the art might expect from skilled workers."

■ Gronemeyer initiated fundamental change in substituting in the diaphragm a high heat conductive material, e. g., stainless steel, and line contact for materials with low thermal conductivity and surface contact. Quote 1 Walker on Patents § 29, at page 182:

> "So, also, where the excellence of the material substituted could not be known beforehand, and where practice shows its superiority to consist not only in greater cheapness and greater durability, but also in more efficient action, the substitution of a superior for an inferior material amounts to invention."

Defendant's abandonment of the use of materials of low-heat conduction capacity in favor of the adoption of rugged materials of high-heat conductivity, and his utilization of the skill of the art in bringing old tools and new type materials into a new, superior and effective combination make the subject patent a valid invention.

Plaintiff offers many arguments for declaring the subject patent invalid. We have discussed those points we feel merit consideration, and it is our judgment that the facts and law germane to the issues before this court compel a determination that defendant's claims are pat-entable invention. Accordingly, we rule that defendant's United States Patent No. 2,841,203 is valid.

A form of order in accordance with this opinion is to be submitted.